Those attorneys who are going to argue the case, please step up to the podium and introduce yourselves. Good morning, Carl Metz on behalf of Plaintiff Appellant Archon. Good morning, Your Honors. Chris Wadley on behalf of Third Party Defendant Spies and Associates. Good morning, Arford Holtzman on behalf of U.S. Shelter and Oak Ridge Adultery. Fifteen minutes each side. May I please the Court and Counsel, the appellant wishes to reserve five minutes for rebuttal, so we'll proceed on ten minutes for initial argument. This case is really about equity and fairness, and in this case, the law is also consistent. The law is about equity and fairness in righting wrongs. The case is before the Court as a result of a ruling against Archon and a motion for summary judgment brought by U.S. Shelter against Archon. Archon's claim is only against U.S. Shelter. And as this Court knows, its review is de novo, and as this Court knows, the standard for a summary judgment is whether or not there's a genuine issue of material fact. And I submit to this panel that the Court below did not adhere to the proper standard in determining whether or not it was a genuine issue of material fact, but rather the Court below impermissibly weighed evidence that was presented to it and came up with this decision. As a result, we believe that the Court's ruling below was an error. You know, Archon in this case, and it bears out in the facts, and I won't go through the great effort, a sanitary sewer system for a new subdivision, a development called the Oak Ridge of Elgin. Nearly two years after they installed that system and after it had been functioning as it was supposed to do, they were ordered to go in and rip out the PVC system and install a stronger new material called ductile iron. Everybody agrees that ductile iron is a stronger system, but it's a better system. And it was just for one portion, it was what we call the deep section of the sanitary sewer. Archon did this work, but they were never compensated for the work, even though the original pipe specification in their agreement was for PVC and it was changed from the original design. I also want to ask you, was there a written contract for this work? There was. There was. For the new work? For the new work, there was not. No. There was not a written contract for the ductile iron work. Right. And when was the offer submitted for the new work? Well, U.S. Shelter, to Chuck Mensick, directed Archon to do this work. Now there was a dispute right then and there as to who was going to pay for it, but they were directed then and there to do the work. So would we suggest from that that they said do the work no matter what it's going to cost? Well, it was similar to the Stark case that we cite in our materials. So the Stark case, and maybe I'll start with that example. The Stark case was about winter concrete, and the contract provided for winter heating but not provided for winter protection. And in that case, the owner directed the concrete subcontractor to do the work because the owner believed that the work that they were disputing about was already an original contract. The contractor that did the work did the work under duress, in essence, because they were told they were going to get thrown off the job, and said we still expect to get paid. Similarly here, the city of Elgin tells U.S. Shelter to do the work, U.S. Shelter directs Archon to do the work, Archon says we'll do the work, but we believe we're entitled to payment for it. Who did you tell that to? Chuck Mensick. And in fact, Chuck Mensick even asked for a cost estimate before we did the work. He did. He did say that. Yes. In Stark, the concrete subcontractor sent a letter, right, to the general saying upon completion of the disputed work, we intend to resolve our claim as provided by the terms of our subcontract agreement. That's correct. That's correct. In this case, I'm sorry, the general sent out a note saying, or rather, said we don't intend to pay for this, right? We shouldn't have to pay. We should not have to pay. And Archon in turn, you know, there was conversations in the deposition testimony from Gary Samantha to Chuck Mensick, and in fact, Chuck Mensick asked for a cost estimate, and they provided a cost estimate as well as cost. And Archon even, you know, it's discussed in Don Luizzo's testimony in advance of doing the work, told them that we didn't feel, Archon didn't feel it was their responsibility. And again, they reiterated it after they did the work. I'm sorry. And that amounts to an agreement under the requirement that one of the elements you have to show is that the owner agreed to pay extra, either by his words or his content. Here the owner says, I shouldn't have to pay. That's correct, and yes, under the, I think you're referring to the Watson, the five Watson elements. Right, in your brief at page 22. And Stark specifically addresses the five Watson elements, and under the facts that we have presented, excuse me, under the facts that we have presented, the agreement portion doesn't require that the owner pro offer and say, yes, I'm going to pay. That's not required. The agreement portion requires that the owner knows or directs the work be done, that the contractor doing the work is expecting some compensation. That is sufficient, and that was determined sufficient by the Stark court. So there was no, you know, the Stark court was pretty clear, the owner thought that it was under the original contract, and they weren't going to have to pay anything extra for it. So there was never, you know, in a sense, a statement by the owner that said, yes, we're going to pay. Now, and you take it a step further, our original agreement provides for time and material for anything that's not in the original scope. It does. So the original contract. But again, in Stark, so did their contract. But in Stark, the cement guy said, I expect to get paid. At the end of the day, I'll do this because it has to be done. But at the end of that, pursuant to our contract on extras, I'm going to be seeking payment on extras. That was not done here. Well, I think it was, though, Your Honor. I mean, it was done, before it was done, first they asked for a cost estimate, second, Archon sent, Archon. Pardon me? That was done by the other side. I'm asking for an estimate. They asked us for an estimate, and we provided, Archon did provide an estimate to U.S. Shelter. And then U.S. Shelter and Gary Samantha, before the work was even done, discussed it, and Archon conveyed to them they expected to get paid. Don Luizzo also had a discussion. There was testimony about a letter that Archon sent prior to the work being done. There was also a letter sent after the work was being done, reaffirming what they said before the work, that none of this is our fault. We expect to get paid for it. So I believe there's actually been more than the start court. How many times is the ground, the street torn up between these two manhole covers? Well, I think that's, there is no definitive answer as to how many times the ground between manhole 108 and 110, it's been dug up multiple times, we'll concede that, but some people say two, some people say three, some people say four. Is there any evidence that other than the sewer system needing to be repaired that somebody else is responsible for that having to be dug up two, three, or four times? Well, the first times there was a material issue, which You get to blame somebody else for that, yes. It was all of us. Or subpar. That's right. It was your fault. That's right. It was a material issue. And in additional times, there was no definitive issue as to who was at fault. Archon just went through and performed the necessary repairs at various portions of the system, so the capacity air test and the deflection test, which ultimately occurred in August of 2005, if I get my years right. So at the end, it was all done. In my view, it was all done with an engineer on site every day whose whole purpose was to ensure that the work was done according to the contract plans and specifications. Counselor, can I ask you to be more specific from Justice Quinn's question? Sure. Did you use field built Ys? You substituted those for the manufactured Ys. Is that right? Field built Ys are actually the use of Ts. Well, it's called Ys in all the briefs. Well, that's their terminology. They're trying to scope the issue. Field built Y is actually the use of a T with an elbow to create basically a main, and you're trying to create a runoff of it to specific Ys. Was there something manufactured on the job that wasn't? No. No, it's just use of pipes, certain sections of pipe and connections, to create this service line off the main. So the plans and specifications say that you can use Ts or Ys. They're trying to assert incorrectly that we can only use Ys, and so they're trying to characterize the use of Ts as a makeshift Y, when in reality, the plans clearly state Ts or Ys, which is why Elgin, when they found out about it, said that they couldn't force us to take them out, because the plans originally said Ts or Ys, and they in their testimony said, well, you know, that may have been a mistake in the plans and specs, but that's what the plans and specs said. All right. What about the use of the SDR35 and SDR26? Oh, and I think that's what was being referenced earlier. That was all remedied, and that's not an issue. It was all remedied when it was discovered that there was the raw material, it was all remedied prior to the completion of the system in August of 2005. And it's even, if you look at, you know, the notes of Spies and Associates, they were watching it all being repaired or replaced, rather, with the SDR26, and at the end of the day, you know, I think it's almost like a comment of hallelujah, whatever, it's all been completed. So that's all been remedied. That's not what's at issue here. But how do we know what caused the problem? How do we know what caused the problem? Well, we know, well, first of all, we know that Archon, according to the testimony, mind you, we have to look at it in the light most favorable to Archon. According to the testimony, they reviewed the same video, and it did not show any evidence of poor workmanship. It did not show any evidence of any failure as a result of anything Archon did. You put that together with what Spies and Associates viewed when they were on the project, and at the end of the day, in August of 2005, it was all done. It passed the error test, passed the deflection test. It was a serviceable, and it's a system that worked for two years. But didn't Spies make some negative comments on the reports? Yeah, early on, you know, ultimately those get remedied. I mean, that's what happens in a construction job. Nobody's perfect. It gets remedied. And so at the end of the day, then, so then two years later, it comes in, and they look at the video, and they talk about cracks, which were really not cracks. It talks about what I would view cosmetic-type things that didn't affect the functionality. It talks about mission couplings, which were approved by the city of Elgin when they were put in. And so you're asking, you know, whose fault it is. Well, number one, I would contest whether or not there's a problem with the system. Number two, the testimony from Archon is that if anything happened, it was ground conditions beyond the control of Archon. So it's not Archon's fault. So to prove our claim, we don't have to prove whose fault it is. We have to prove that we did the work, right, to begin with. But when you began your presentation, you talked about equity. Shouldn't this all be considered part of the equitable settlement or disposition of this case as to what actions you took versus what actions the other side took as far as the initial construction? Well, certainly. I mean, the equities are, at the end of the day, Archon stepped up. And when issues were as a result of what Archon did, Archon took care of those. And with the material issues, they raised those issues, and they took care of those issues so that when they were done in August of 2005, the system was a fully complete operational functioning sanitary sewer system. Then two years later, somebody says, well, you know what? For this run-up pipe that's so deep, we want you to pull it out and put in ductile iron. Well, what happened, of course, is pursuant to your contract, Elgin was allowed after one year to go and run tests on it with video or whatever else they wanted to do. And for whatever reason, they did it two years later, and they said there were problems. Again, your guy said there were no problems. So they did it, but they did it a year late. So it's not on a whim. Elgin went back as they were supposed to. Well, and Elgin went back and said, you know what? We decided that PVC is a strong enough. And so you follow that line of thought. I mean, Archon is not accepting the risk that the city of Elgin comes in two years later and says, you know what? We've decided that PVC isn't strong enough for this run. We need stronger material. So rip it all out. Did you not, when you signed the contract, that Elgin would have to pass this thing one year later? One year later. We accepted the risk that one year later, but not two years later that they would come in and say, you've got to put in a new, stronger material. Go ahead. Mr. Metz, let's get to the summary judgment motion and the hearing. At that time, what evidence was presented to the trial court that this would be an extra charge and that US Shelter was to pay for it? What evidence existed for the court to be precluded from entering summary judgment against you? Certainly. Well, there was sufficient evidence, A, that it was a material change, a design change, based upon switching from the material at the time. B, the court was pro-offered litany of documents and deposition testimony to summarize that Archon contested at the time that they were asked to do the work that they had to do the work. I'm talking about the ductile iron. Archon contested before they put in the ductile iron that it had to be done. And that was in the deposition testimony of Don Loiseau and Gary Cementa, which the court was provided in their entirety. So US Shelter was appraised to the fact of what the costs would be for the six? They were. They were, because they specifically asked themselves. Chuck Mensick, you know, foreman or supervisor for US Shelter, specifically asked Gary Cementa, and this is set forth in Gary Cementa's deposition testimony, that Chuck Mensick asked before the work was done for some type of estimate. That seems to be your biggest thing, Mr. Metz, that, by the way, they asked for an estimate. That must mean they agreed to pay whatever you charged. I asked the previous people here, we rule on, in civil areas, we rule primarily on summary judgment cases. And the choices, of course, are to affirm them or reverse them. And so let's assume, as I asked the last group, let's suppose we reverse, we send it back. What new evidence are you going to present at trial or in a renewed motion for summary judgment by the defense that will make you win this case? Well, first of all, I mean, I don't think there's new, I think the evidence is already there. I think, as I said at the beginning, I think the court weighed evidence instead of looking at the evidence in the light most favorable to us. And saying, we agree with you. So what? So now we send it back. And now a similar judge will look at this and say, you know, looking at this, this is a complete loser for you, that you failed. What is the, how are you going to prevail at trial with this evidence? Well, I think I'm going to prevail at trial is that I don't believe the court below considered Archon's review of the video. I mean, I think the court below considered significantly what others said about the video. You know, concluded there were cracks when in actuality, if you look at it, and our people have 30 years experience, more experience than anybody, you know, in this case who testified, you know, that there weren't cracks. And so I think number one there. I mean, number two, I don't think the court considered, I think there's one letter that was referenced in the deposition that wasn't part of the record. You know, if you're looking for something new, that's something new to begin. But I think when the court gets a second chance to look at the evidence that's already there, plus, you know, perhaps some additional documents such as the letter was referenced, that's how we're going to prevail. I mean, because the court's going to then realize that some people from the city of Elgin, Omar Santos, somebody relied on heavily by the defendants, never went to the job site, never designed a sanitary sewer system, never put in a sanitary sewer system. So I think there's credibility issues that when you have a trial effect. Well, I don't know of any city inspectors who would have designed sewer systems. I don't know, but I'd be kind of surprised that there were anybody in any city on that site, the municipal site, that actually designed the system. Counsel, can I ask you, when the city of Elgin demanded that the ductile iron be put in versus the PVC, and correct me if I'm wrong, I think there were two reasons for that. One, because of the problems that had been occurring between Manhole 08 and 10. And also, the PVC needed a 30-day waiting period for some type of mandrel test, I believe it was. Is that correct? Mandrel test. That was part of the testimony, but also the same testimony from the same person of William Becker said that his research indicated that it wasn't strong enough. That the PVC wasn't strong enough. PVC was not strong enough at that depth. And indicative is, it's just this one section. You know, the same letter that calls for the replacement of the one section, points out a couple of other areas in different parts of the project that PVC can remain. And it's just fixing a fitting or a connection, which Archon did, and which is not part of this claim. But let me ask you, as far as cost, is there any difference in the cost of laying iron ductile pipe, other than the cost of the pipe itself, and laying it versus PVC? Well, had the project been originally specified for ductile iron, then... Right, I just want to know about the new cost. Yes, so the reason there's a new cost is you have to dig up the old one. I understand that part, but is there any difference in labor putting in PVC versus iron ductile? If it's done once, no. I mean, it's done at the beginning, but see, now you've got twice the labor. Because we basically put the system in twice. The original contract says we put the system in once. Thank you. Am I out of time? If you'd like to have five minutes rebuttal, I would suggest you conclude. Thank you, I would like to. Thank you. May it please the Court. My name is Chris Wadley. I represent the third party defendants, Spies and Associates. I also have my co-counsel, Ed Gibbons, here. He didn't make his way up to the council seats here, but he's back there. Your Honors, with respect to timing, I know that the defendant, U.S. Shelter, has some things it wants to say with regard to its cross-appeal, and so we've decided to split time. I'll take 12 minutes, and they'll take three. Your Honors, first, I think Justice Connors raised a critical question here, is that how do we know what caused these defects? We start with Elgin's letters, where they state the reasons why this section of pipe needs to be replaced, and that's Bill Becker's July 5, 2007, letter, where he lists a laundry list of items that need to be repaired, one of which is the section between 108 and 110, and he identifies three problems in the line that he says require it to be replaced. One, the sections of the service lines, the lines that go from the main line to the houses, have punched through into the main line. Second, portions of the pipe where the mission couplings were installed have become misaligned, and then third, he identifies cracks in the sewer line. Under Illinois case law, for Archon to establish that it's entitled to be paid extra for this work to do the replacement work, it has to prove by clear and convincing evidence that it was not at fault for requiring the replacement work. In order to sustain that burden, they have to introduce evidence showing that they weren't at fault for creating the conditions that necessitated the replacement, namely these defects. There's absolutely no evidence in the record, scientific or otherwise, establishing that Archon was not at fault for these defects. As the trial court properly concluded, all of the statements in the record are speculative. Well, it could have been this. It could have been that. The bottom line, however, is that there's no scientific evidence in the record saying these defects were not caused by Archon's workmanship. They were caused by something else. Now, on a Does that mean there's a question of fact? No, because Archon has to come forward with competent evidence upon which it can win its case in order to withstand a motion for summary judgment. There's not an issue of fact because there's simply no evidence to prove one of the essential elements of Archon's case. Now, on appeal, Archon cites the testimony of Gary Cementa and Don Luizzo, and they claim, well, there's an issue of fact because those gentlemen looked at the videotape and concluded, well, those defects really didn't exist, and B, we did everything right on site. Well, that's not what those gentlemen said. With respect to the service lines punching through into the main line, I asked Mr. Luizzo, so the service riser pipe punched through into the fitting? Answer, yes. Question, do you have an opinion as to what caused the service line to punch through into the fitting as depicted in Exhibit 12? Answer, I do not know what caused that. Question, is that what you would expect a normal installation to look like? Answer, no. Question, what would a normal installation look like? Answer, I would expect the riser pipe to come into the hub of the fitting. Okay, and question, would the riser pipe then essentially be flush with the edge of the fitting? Answer, yes. On the same topic, Mr. Cementa was asked, do you see how the service protrudes into the main line? Answer, I see it protruding, yes. Question, do you know why it protrudes into the main line? Answer, do I know why? Question, yes. Answer, no. Question, when Archon installed the service into the main line, was it Archon's intention to have the service protrude into the main line as depicted in the picture? Answer, no. Mr. Cementa was asked, would you agree with me that the protrusion of the service line into the main line is not in accordance with the plans for the construction of the sewer line? Answer, yes. Question, so is it your answer that you don't have any opinion as to what would have caused the protrusion of the service line into the main line? Answer, I do not. So he acknowledges that this protrusion exists, and he has no explanation for it. Likewise, with respect to the, with the misalignment, Mr. Cementa is asked, do you see how pipe number two appears to be lower than pipe one? Answer, yes. Do you know why pipe number two is lower than pipe number one? I do not. Question, do you believe it complies with the plans and specifications that pipe two is lower than pipe one? The witness, no. He agrees that it doesn't comply with the plans because it's misaligned, and he doesn't know why it's misaligned. Archon does not have sufficient proof, in this case, to establish the essential element of its claim that it was not at fault for the defects. Now, the other thing Archon does is that it pretends that these defects did not exist, notwithstanding the testimony of its representatives, and says, well, this was just a design change, as Justice Quinn said, on a whim. They say this was on a whim by the city of Elgin that they wanted ductile iron. Absolutely not the case. Mr. Santos, the Elgin engineer, was shown Mr. Becker's letters, which identify the three defects in the line, and I asked him, and so just referring to Exhibit Number 11, which is Mr. Becker's July 26, 2007 report, and Exhibit Number 6, which is Mr. Becker's July 5, 2007 letter that we previously referred to, do these two documents identify the problems with the line that prompted the city to require it to be replaced? Answer, yes. Question, are you aware of any other problems with the line that prompted the requirement that it be replaced? Answer, no. The line had to be replaced because of these defects that were identified as a result of the videotape inspection. Now, ultimately, the city decided that they wanted it to be ductile iron for a number of different reasons. Primarily, the sewer was already in service. The homes were occupied. They didn't want to run into the same problems they had with the previous installation, and so they said, if you've got to dig it up and replace it, you're going to do it with ductile iron this time. We don't know what caused the problems, why all these problems existed, but we're not going to take the chance on a second one. Second, as Justice Connors pointed out, there was a requirement, a forward requirement, Fox River Water Reclamation District requirement, that whenever you install a new PVC sanitary sewer, it cannot be put into service for 30 days because it has to pass a mandrel test. A mandrel test is basically something where they go in with some kind of device to make sure that the pipe is still circular, because a PVC pipe is subject to, this is not the scientific term, but squishing. It can squish. A ductile iron pipe cannot squish. So they have to go in there with a mandrel 30 days after it's been installed to make sure that it hasn't deformed. You don't have that waiting period with ductile iron, and these homes were already in use. They needed the sanitary sewer to work immediately, so it had to be done with ductile iron. So, and that was the basis for the trial court summary judgment. It was correct. There was no evidence to prove that these defects were not Archon's fault. With respect to the other element, and the trial court didn't reach this element, but it's also sufficient to sustain the court's decision, is this idea that Archon, which was an essential element of their claim, had to prove by clear and convincing evidence that U.S. Shelter agreed to pay extra for the replacement work. Both of Archon's representatives admitted that U.S. Shelter never agreed to pay. I asked Mr. Sementa, did anyone from U.S. Shelter ever indicate that they would pay you for the replacement work? Answer, indicate to me, no. Question, are you aware of U.S. Shelter at any time expressing any indication that it agreed to pay for the replacement work? Answer, no. Mr. Louzo was asked the same questions. Are you aware of whether U.S. Shelter indicated verbally in writing or otherwise that it would pay Archon for the replacement work? Answer, no, I do not recall any statement. So I asked, why did you do it? He said, why didn't Archon just refuse until U.S. Shelter agreed it would pay? His answer to that was, we are on good terms with U.S. Shelter and we wanted to continue that. It did it because it wanted to maintain the business relationship with U.S. Shelter. Counsel, let me ask you a question. Sure. The fifth prong of the analysis that the extra work was not made necessary through the fault of the contractor. Yes. Is there any time frame on any of the cases that construe that relative to this, like 20 years later, or just in terms of any cases you've seen on that? This is two years. No, I haven't seen that in the case law, quite frankly. But, I mean, that's something that's, if it's true that it's not their fault, it's something that should easily, Archon should be able to introduce proof of that. They could introduce expert testimony to say there was nothing wrong with the original installation. All of these defects are attributable to the passage of time to changing ground conditions, which is something that was suggested by one of their representatives. But if you look at the testimony, there's absolutely no foundation for that. It doesn't explain what changing ground conditions existed. So if it was merely a passage of time rather than Archon's fault, they could have introduced evidence establishing that point. In addition to there being no evidence that U.S. Shelter agreed to pay extra, there's no reason for U.S. Shelter to agree to pay extra, because one thing that wasn't discussed during Mr. Metz's presentation are the Illinois intelligence standard specifications, which are incorporated into the design documents, which Archon is contractually bound by. The Illinois standard specifications state that all work which has been rejected or condemned shall be remedied or removed and replaced by the contractor at his own expense. The Elgin standard specifications with regard to the videotape inspections state any deficiencies or defects in the pipe material or construction, as noted by the engineer, shall be repaired at the contractor's expense prior to final acceptance by the city. Archon assumed the risk that when Elgin took a look at that videotape, it was going to find problems and it was going to require that it be replaced. Archon assumed that risk under the contract documents, under the Elgin standard specifications. Now with respect to this idea that, well, U.S. Shelter asked for a cost estimate, the only evidence in the record, even if that's material to anything, which we don't think it is, the only evidence in the record that U.S. Shelter asked for a cost estimate is Gary Cementa's self-serving testimony where he says, quote, I think I was asked for a rough estimate. He could not recall who asked him. There's no evidence in the record that any estimate was actually provided. The only estimate, the only document that's in the record that can be characterized as an estimate is an invoice that was submitted after the work was already completed. So that's not sufficient to establish, by clear and convincing evidence, that U.S. Shelter agreed to pay extra for the extra work. So failing those arguments... In summary judgment, the standard is not to produce clear and convincing evidence to convince us. I don't have to convince anybody in summary judgment. No, but there is an evidentiary burden that must be met by the non-moving party, and that is they have to introduce sufficient evidence that would be... So a question of fact. Right, enough evidence that a finder... And I may have the worst case in the world, but if there's a question of fact, it's not up to the trial court, it's up to a jury. Or the trial facts. I agree with that as an abstract principle, Your Honor. In this case, however, there was not even enough evidence submitted to create that issue of fact. There was not enough evidence that a finder of fact could resolve the case in our cons' favor, because there was an absolute lack of evidence on those two elements that we discussed. And the case law is clear that they do have a burden to come forward with some admissible evidence, admissible evidence by which they could carry their burden of proof at trial. And Archon did not do that in this case. And I'll just briefly address that Archon also raises for the first time on appeal, quantum merit and unjust enrichment. Those arguments were never raised to the trial court. They're waived. We also go through in the briefs the elements why they don't apply here. There was an express contract that governed the relationship, that incorporated these Elgin specifications. No reasonable expectation of payment, and no proof of injustice here, because there's no proof that they're not responsible for requiring the replacement work in the first place. And then finally, Your Honors, with respect to the third party complaint, of course, the trial court granted summary judgment on Archon's claim against U.S. Shelter, and then summary judgment on U.S. Shelter's third party complaint against Spies and Associates, finding that once it's determined that U.S. Shelter is not liable to Archon, then U.S. Shelter is not damaged by anything Spies and Associates did. We believe that both of those judgments should be affirmed, because there is no damages aside from any potential liability to Archon on the main claim. On U.S. Shelter's claim. But we also argue, and this court can affirm on any grounds that's available in the record, is that there isn't sufficient evidence for U.S. Shelter to sustain its third party complaint against my client in this case. There's no evidence in the record, no admissible evidence in the record, that there was anything wrong with the original design. It was approved by all the relevant governmental bodies. PVC had been used at similar projects at similar depths. And there's no testimony in the record that our plans were deficient in any way. With respect to the inspection obligations, my client had two obligations. One was to be on site and observe the construction. And second was to prepare daily reports. He performed both obligations. And if you think about it realistically, there's no way that liability for this can be shifted to my client by virtue of a quote-unquote negligent inspection. Because you have Archon saying they did everything correctly in accordance with plans and specifications. No workmanship problems. This was just a design change on a whim by the city of Elgin. If that's true, and they're entitled to recover for the extra work they did to replace it, then my client didn't do anything wrong with the inspection either, because they installed it correctly according to plans. We don't believe that. I mean, we think that they didn't prove that they did it according to plans. Alternatively, if they did not install according to plans, and they were deficient, maybe my client should have caught that and put it in the reports. But my client is not responsible for their defective performance. They performed effectively. They can't recover in the first instance. There's nothing to pass along to my client. But like I said, that's a minor point. But the main point here is that we believe this court should affirm the summary judgment against Archon on its main claim for the reasons I discussed previously. And as a matter of course, the third party complaint against my client falls as well. But realistically, you understand, Mr. Wiley, in spite of your excellent brief, and I mean that, and your excellent argument today, that's why it's fun to have oral arguments, if we send one back, we're likely to send both back, right? I am resigned to that fact, Your Honor. I didn't want you to go away feeling it. You're slighted, actually. But I have to make the argument. Thank you. Thank you. May it please the court. Arthur Holtzman on behalf of U.S. Shelter and Oak Ridge of Elgin, LLC. Obviously, we had joined Spies in seeking affirmation of the trial court's ruling, granting summary judgment against Archon in favor of U.S. Shelter. There are three other points that are, one, Mr. Wiley addressed, two, that are not addressed. One is we had a cross motion for summary judgment against Archon for the damages that occurred when they dug up the trench for the fourth time. People had moved in and driveways, lawns, curbs, sidewalks, et cetera, were destroyed. That cost U.S. Shelter $74,000 and change to repair. There was an affidavit of Mr. Sorensen from U.S. Shelter submitted in support of our motion. There are no contrary affidavits, no contrary evidence. We submit that because that's by February 2006, people are starting to move in, and this work is being done in October 2007 to put the ductile iron in to make the final repairs, that there was collateral damage to the lawns, sidewalks, driveways, et cetera, and that we paid that and that should be the responsibility of Archon. The second argument is we sought legal fees. Under Section 17 of the Mechanics' Lien Act, if the court found that the lien claimant brought in action without just cause or right, the court could award attorney's fees. Since the standards for seeking these extras to be paid for seeking repairs were not met by Archon, we think that there wasn't just cause for filing the lien in the first place. The trial court disagreed. We took an appeal on that. And the final is Mr. Wadley's point, which I think I've concluded is premature vis-a-vis the relationship of U.S. Shelter and Spies. The trial court found that since we presented, Shelter presented no evidence in support of its claim against Spies, that it had been damaged beyond the amount of Archon's claim, there was no indemnity, there's nothing we're seeking from Spies. There was no cross motion for summary judgment. Archon did not seek summary judgment in this case. It's Shelter and Spies that go after Archon. So the issue hasn't been reached. If this court affirms, the issue will never be reached because Shelter hasn't been forced to pay anything beyond the original contract price, the retention, to Archon. It is only if the trial court had ruled that Shelter, and it couldn't have ruled because there was no motion from the plaintiff. But if there was a cross motion, then we seek indemnity from Spies. And I agree with Justice Quinn. It's an issue that only comes up if it goes back to the trial court. And we have a trial on that. Thank you very much. Thank you. May it please the court. I realize I have five minutes, so I'll try and address some of the issues that were raised. Sort of working backwards, with respect to U.S. Shelter's cross appeal on their motion for a summary judgment with respect to their breach of contract claim. I'll submit, and I think it's indicative if you look at the amount allocated in their brief, they pro-offered no evidence of any breach by Archon, and let alone, they pro-offered no evidence of any relationship to any breach, to any damage. It's true they submitted an affidavit, said I had to pay some money, but there's no correlation whatsoever. And there's never been any correlation whatsoever as to anything Archon did with respect to their contract. And in fact, they I think just admitted that they have no evidence as to what caused the conditions seen two years after it was installed. Secondly, U.S. Shelter's cross motion with respect to attorney's fees. I just rest on my brief and just add one extra point. The attorney's fees provision in the McKinsey Act is akin to sanctions under 137. It's gotta be bad faith, it's gotta be vexatious. There's no evidence of any bad faith or vexatiousness on the behalf of Archon, so the court should be supported in that decision. With respect to addressing the issues that we raised, we'd like to address a couple of points. We included in our record, and it's in our appendix A158, a letter that was sent after the ductile iron work had been done in October of 2007. I'm giving my ears, I think so. But it refers to a letter they had written prior to doing the work and reaffirmed what they said prior to doing the work, that it's not our fault, we expect to be paid. And that's in the record. I think it's telling that the party step up here, the defense steps up here and says we're relying upon Omar Santos to look at a letter written by William Becker to tell you why Elgin required the change, the ductile iron. They're not here talking about what William Becker said, because William Becker said in his own testimony, and I give the reference, it's in his deposition, the record reference is 1717 and 1742 to 1743. Becker said that on behalf of Elgin, he did his own research. And after conducting the research, he determined that stronger material was needed at this depth. With respect to the issue that it had to be ductile iron because it was already in service. If you look at all the other work that was required that they allowed PVC to remain, those were in service as well. So there was no issue with respect to putting PVC in portions of the system that were in service. So I submit, when you sort of weed through all of the noise, the sole reason that ductile iron was required is because Elgin determined that it was so deep in this area from manhole 108 to 110 that PVC was not strong enough and it had to be ductile iron. That comes from William Becker, 1717 and 1742 to 1743. The issue of quantum arrowhead, that was raised in Stark. And it was, by the way, Stark was decided after- It was raised here down below. I'm trying to clarify that. It was not raised down below by us. But it was a new issue for us because it was Stark brought it to our attention which was decided after our case. We cite Polk versus- Well, quantum arrowhead's been around for centuries, isn't it? That's right, that's right. Initially, the thought was that contract, you don't get quantum arrowhead. Stark now, I believe, has opened that up for us. And I see the panel's packing up, and I will finish with that. Thank you. Thank you. Thank you for your briefs and your excellent oral arguments. The case is taken under advisement. We are adjourned.